AUSA: James G. Mandilk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**24 MAG 675**

UNITED STATES OF AMERICA

v.

MOSHE BERGER,

Defendant.

**SEALED COMPLAINT**

Violation of 18 U.S.C. § 875(b)

COUNTIES OF OFFENSE:
ROCKLAND, NEW YORK, BRONX

SOUTHERN DISTRICT OF NEW YORK, ss.:

JENNIFER LEWIS, being duly sworn, deposes and says that she is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

### COUNT ONE
### (Interstate Extortion Threat)

1. On or about December 6, 2023, in the Southern District of New York and elsewhere, MOSHE BERGER, the defendant, knowingly and with intent to extort money or things of value from a person, transmitted in interstate and foreign commerce communications containing threats to kidnap and injure a person, to wit, BERGER communicated by telephone from the State of New York to the State of New Jersey a threat to kill an individual (the "Victim") if the Victim did not come to BERGER with money immediately.

(Title 18, United States Code, Section 875(b).)

The bases for my knowledge and for the foregoing charge are, in part, as follows:

I am a Special Agent with the Federal Bureau of Investigation ("Investigating Agency"), and I have been involved in the investigation of the above-described offense. This Affidavit is based upon my participation in the investigation; my examination of reports, records, photographs, videos, and audio files; and my conversations with other law enforcement agents and other individuals, as well as my training and experience. Because this Complaint is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during this investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated. In addition, unless otherwise indicated, statements by others referenced in this Complaint were not necessarily made to me but may have been provided to me by someone else to whom I have spoken or whose report I have read (and who, in turn, may have had either direct or indirect knowledge of the statement).

### The Victim's Car-Rental Businesses

2. Based on my and other law enforcement officers' conversations with the Victim, I have learned the following things, in substance and in part:

a. From approximately 2020 to the present, the Victim has operated car rental businesses in Rockland County, New York, within the Southern District of New York.

b. The Victim has rented cars to people without regard to whether they are residents of the State of New York. Someone who rents a vehicle from the Victim may drive it freely across state lines—including, for example, to the nearby State of New Jersey, which a renter can generally reach by driving for less than half an hour after acquiring a rented vehicle from the Victim.

c. In or around late winter or spring of 2020, the Victim rented his own personal automobile to friends and neighbors. Over time, he began to lease additional vehicles from car dealers and to rent those vehicles to others.

d. In or around the late winter or spring of 2021, the Victim spoke with someone (the "Partner") about the possibility of the Victim and the Partner going into business together. The Victim and the Partner agreed to jointly operate a car rental business. They established a corporate entity ("Business-1") and, through that entity, they began to jointly rent cars.

e. In or around the spring of 2021, based on disagreements about the schedules that the Victim and the Partner should keep and the roles each should occupy in Business-1, the Victim decided that he wanted to operate the car rental business by himself. He spoke to the Partner and asked whether the Partner would be willing to sell his share of Business-1 to the Victim. The Partner agreed to sell his share of Business-1 to the Victim for $85,000, but the Partner stated that he would need the money within a week. The Victim paid the Partner $5,000 and said that he would attempt to acquire the other $80,000.

## BERGER Lends Money to the Victim

f. The Victim asked several people whether they knew of anyone who could lend him $100,000 so that the Victim could buy out the Partner's share in Business-1. Soon thereafter, a friend ("Friend-1") told the Victim that he knew someone who might be willing to lend $100,000 to the Victim: MOSHE BERGER, the defendant. At the time, the Victim did not know BERGER. Friend-1 told the Victim that Friend-1 was acquainted with BERGER and believed that BERGER had acquired a large sum of money and might be willing to lend money to the Victim.

g. The Victim's religion limits his ability to enter into certain types of moneylending contracts. In advance of his meeting with BERGER, the Victim obtained and printed a form document that could memorialize a loan in a manner that the Victim believed to be religiously acceptable. The document was written in Hebrew, and the Victim stated that he understood its overall import but could not read it word-for-word.

h. On or about June 22, 2021, the Victim and BERGER met in person at the home where the Victim lived at that time. They spoke for approximately two hours, and the Victim and BERGER agreed that BERGER would lend the Victim $100,000 and that the Victim would later repay BERGER $120,000. The Victim and BERGER memorialized the agreement that day by filling out and signing the Hebrew form document that the Victim had obtained and printed.

    i. On or about June 23, 2021, BERGER provided $100,000 for the Victim's benefit, as agreed. Specifically, at the Victim's instruction, BERGER signed an $80,000 bank check payable to a relative of the Partner, for the purpose of buying out the Partner's share of Business-1; and BERGER delivered $20,000 cash to the Victim in person. The Victim immediately delivered $15,000 of that $20,000 to the Partner in person to reimburse the Partner for capital contributions the Partner had made to Business-1. The Victim deposited the remaining $5,000 into the Victim's bank account.

    j. The Victim and the Partner then ceased operating Business-1.

    k. On or about June 23, 2021, the Victim told BERGER that the Victim intended to repay BERGER within three months. The Victim provided to me an image of a bank check in the amount of $80,000, dated June 23, 2021. BERGER is listed as the remitter, and the check is payable to a relative of the Partner.

    l. Together with his wife, the Victim established a corporate entity ("Business-2"), and through Business-2, the Victim began to operate the car rental business on his own.

    m. Business-2 carries out substantially the same kinds of commercial activities as Business-1 did. Business-2 continues to rent vehicles to customers. Like Business-1, Business-2 rents to customers without regard to their states of residence and allows customers to drive rented vehicles across state lines.

    3. Based on my involvement in the investigation, including my review of text messages, audio files, photos, and videos that the Victim provided to law enforcement, as well as historical cell-site location information, I have learned that on many occasions from approximately June of 2021 through the present, MOSHE BERGER, the defendant, has communicated with the Victim, including through phone calls, voice memos, the transmission of photos and videos, and text messages. BERGER has frequently contacted the Victim on a particular messaging application ("Application-1"). In communicating with the Victim, through Application-1 and otherwise, BERGER has consistently used a particular telephone number (the "Phone Number"). BERGER has placed calls to the Victim while BERGER was in Rockland County, New York County, and Bronx County, New York, among other places.

**BERGER Lends the Victim More Money and the Victim Partially Repays the Loans**

    4. Based on my and other law enforcement officers' conversations with the Victim, I have learned the following things, in substance and in part:

    a. On multiple occasions during approximately July and August of 2021, MOSHE BERGER, the defendant, contacted the Victim, offering to lend him more money. BERGER and the Victim agreed that BERGER would lend additional money to the Victim and that the Victim would later repay that additional money with interest.

    b. BERGER lent the Victim the additional money in cash. The Victim failed to consistently record either the amounts that BERGER lent to the Victim or the interest the Victim agreed to pay. The Victim does not know the total amount lent by BERGER or the total amount of interest he agreed to pay.

    c. The Victim has periodically repaid BERGER some of the money that the Victim owes BERGER, sometimes in cash and sometimes using other payment methods. The Victim does not know the total amount that he has repaid to BERGER, but the Victim believes that he has repaid less than half of the aggregate amount of principal and interest owed.

    d. The Victim sometimes repaid BERGER by leaving cash somewhere and sending BERGER an image showing where the Victim had left the cash.

    e. After the Victim told BERGER that the Victim would be unable to timely repay the entire sum that BERGER lent to the Victim, BERGER expressed frustration. BERGER said that he was suffering additional losses because of the Victim's failure to timely repay him.

   5. Based on my involvement in the investigation, including my review of text messages, audio files, photos, and videos that the Victim provided to law enforcement, I have learned the following, in substance and in part:

    a. On multiple occasions, the Victim and BERGER memorialized in text messages that one had received cash from the other.

    b. On multiple occasions, the Victim sent photos to BERGER displaying cash.

   6. Based on my and other law enforcement officers' conversations with the Victim, I have learned the following things, in substance and in part:

    a. The Victim and MOSHE BERGER, the defendant, have both suggested ways that the Victim could either reduce or eliminate his debt. BERGER has sometimes asked the Victim to pay some of BERGER's daily living expenses, which the Victim has sometimes done. The Victim has, for example, swiped a credit card transaction at BERGER'S urging, paid a telephone bill for BERGER, and paid for a storage unit in Florida for BERGER'S use.

    b. The Victim has attempted to acquire mortgages on multiple homes in Florida, at BERGER'S request, so that BERGER could live in those homes. At one point, BERGER told the Victim that if the Victim obtained a mortgage for a particular property, made the down payment, and made all the monthly payments for the duration of the mortgage, while allowing BERGER to live in the property, then BERGER would consider the Victim's debt satisfied. None of those real estate transactions closed.

    c. On or about March 25, 2022, the Victim's brother made a $30,000 wire transfer to a company in Florida (the "Florida Company"). The Victim's brother made this wire transfer at the Victim's request. BERGER directed the Victim to make the $30,000 wire transfer to the Florida Company as part of the repayment of the Victim's loan.

   7. Based on my review of an image of a portion of a bank account statement, which the Victim provided to me, I have learned that on or about March 25, 2022, the Victim's brother made a $30,000 wire transfer to the Florida Company.

   8. Based on my review of publicly available information about the Florida Company, I have learned that MOSHE BERGER, the defendant, is listed as a secretary/treasurer and registered agent of the Florida Company.

**BERGER Threatens To Harm or Kill the Victim Unless the Victim Pays BERGER**

9. Based on my and other law enforcement officers' conversations with the Victim, I have learned the following things, in substance and in part:

    a. On multiple occasions since approximately the spring or summer of 2022, MOSHE BERGER, the defendant, has threatened to physically harm the Victim unless the Victim paid BERGER. BERGER has also, on multiple occasions, threatened to kill the Victim unless the Victim paid BERGER.

    b. For example, on at least one occasion BERGER told the Victim, in sum and substance, that BERGER might commit suicide but that he would not die alone.

    c. BERGER has threatened the Victim in person, as well as through phone calls, text messages, and the transmission of threatening images and videos. BERGER has sometimes sent threatening communications through Application-1; on other occasions, he has used a standard phone call, text message, or multimedia message. Whether sending threats by Application-1 or phone, BERGER has consistently used the Phone Number.

    d. BERGER has come to the Victim's house on multiple occasions. BERGER has followed the Victim in public.

    e. On one occasion, BERGER drove to the Victim's house in a silver car and the Victim observed what he believed to be a firearm in the backseat of the car.

    f. BERGER's threatening statements, especially given his apparent access to a firearm, have placed the Victim in fear of imminent bodily harm.

    g. The Victim lives in constant fear for his safety and the safety of his family. He has altered his daily behaviors to avoid BERGER—attending a different synagogue and shopping at a different grocery store, for example.

    h. Others have told the Victim of threatening and concerning statements that BERGER has made to them. Friend-1 told the Victim, for example, that BERGER threatened to harm Friend-1 and another member of Friend-1's family because of Friend-1's involvement in setting up BERGER's loan to the Victim.

    i. BERGER contacts the Victim frequently, sometimes multiple times a day.

    j. The Victim has made payments that he otherwise would not have made because he feared for his safety. Because of BERGER's threatening statements, for example, the Victim paid BERGER $100 through an electronic payment application on or about January 5, 2024, and paid BERGER another $100 through an electronic payment application on or about January 10, 2024.

10. Based on my review of publicly available photographs of MOSHE BERGER, the defendant, as well as video footage provided to me by the Victim, I have learned the following, in substance and in part:

  a. A man has, on multiple occasions—including September 8 and December 4, 2023—approached and knocked on the Victim's front door. This man matches BERGER's appearance, in that he has a similar skin tone, height, and build. This man has also on multiple occasions worn the same distinctive sweatsuit.

  11. Based on my involvement in this investigation, conversations with other law enforcement officers and/or contractors, and my review of audio files and reports, I have learned the following, in substance and in part:

  a. The Victim provided to me voice memos and told me that MOSHE BERGER, the defendant, sent those voice memos to the Victim from the Phone Number.[1]

  b. In these voice memos, BERGER spoke in a combination of Yiddish and English.

  c. At my direction, law enforcement employees and/or contractors who understand Yiddish and English drafted reports summarizing the voice memos. These reports are not verbatim recitations of the statements made. Rather, they are descriptions of the sum and substance of the voice memos, except where quotation marks are used; words in quotation marks reflect verbatim translations. Based on my review of these reports, I have learned that BERGER sent voice messages to the Victim that said the following, in sum and substance:

    i. Something is going to happen because it has been already three years.

    ii. The blood could flow.

    iii. BERGER does not care how the money comes to him or he will come for "your blood."

    iv. BERGER does not care about the cops since "you already took my blood and I will take yours."

    v. BERGER promises to dance on "your head."

    vi. The red line is here.

    vii. It has to stop and BERGER does not care about anything at this point.

    viii. The bullet is cheaper than 400,000 dollars. The bullet costs two dollars and it is cheaper "just to shoot you."

---

[1] A voice memo is an audio recording sent from one person's smartphone to another's using an application like Application-1. A voice memo sounds like a voicemail. Unlike a caller who leaves a voicemail, however, the sender of a voice memo intends to transmit the audio recording, rather than leaving the audio recording only after the receiver fails to answer a phone call.

   ix.  If BERGER has to come to "where you are, there will be broken windows, blood," and the Victim has to come to BERGER since "you owe me the money and must come to me" and if BERGER will come it will all be "lively scene – broken windows and blood" with a slash hammer and the Victim should not worry as BERGER will get everyone involved.

   x.  The Victim could sell his BMW and even his pants to make sure that BERGER does not have a loss and he does not care how it happens. BERGER "promises" that he will wait a bit and then he will shoot the Victim and if "you shed my blood, I will shed your blood…how did I wrong you that you take my blood? I did you a favor and gave the money but you are taking my blood."

  12. Based on conversations with the Victim and conversations with a friend of the Victim ("Friend-2"), I have learned the following, in substance and in part:

   a. On or about December 6, 2023, the Victim called Friend-2 and told Friend-2 that MOSHE BERGER, the defendant, had called him the prior night and made threatening statements. The Victim expressed his fear to Friend-2 and sought Friend-2's advice. Friend-2 suggested that the Victim meet Friend-2 that day in Passaic, New Jersey.

   b. Later that day, while the Victim and Friend-2 were together in a car in Passaic, New Jersey, BERGER called the Victim. The Victim placed the call on speakerphone, and Friend-2 could clearly hear what BERGER said. During that call, BERGER said, in sum and substance, that if the Victim did not come to BERGER with the money immediately, BERGER would kill the Victim.

   c. Friend-2 or the Victim then suggested that BERGER contact Friend-2 so that Friend-2 could attempt to mediate. BERGER texted and called Friend-2 and they agreed to meet in person at a mall in New Jersey that same day.

   d. That same day, BERGER and Friend-2 met in person as they had agreed. BERGER told Friend-2, in sum and substance, that the only way to resolve the situation was for the Victim to pay BERGER $750,000. Friend-2 responded, in sum and substance, that this was not realistic. BERGER replied, in sum and substance, that if the Victim did not pay BERGER, then BERGER would kill the Victim and that a bullet only costs $2. BERGER demanded that Friend-2 bring the Victim to BERGER immediately.

   e. The Victim was not present for the in-person meeting between Friend-2 and BERGER at the mall. Soon after that meeting and on the same day, Friend-2 and the Victim met again. Because the Victim imminently feared for his safety, he and Friend-2 drove to a police station, promptly and on that same day, to report the threats.

### The Interstate Nature of the December 6, 2023, Call

  13. Based on my participation in this investigation; my review of historical cell-site location information for the Phone Number; and my conversations with the Victim, Friend-2, and

other law enforcement officers, including an officer with expertise in interpreting historical cell-site location information, I have learned the following, in substance and in part:

    a.    The Victim frequently travels to New Jersey, which is near where the Victim lives. On multiple occasions, the Victim has received threatening communications from MOSHE BERGER, the defendant, while the Victim was in New Jersey.

    b.    As described in Paragraph 12 above, on December 6, 2023, BERGER called the Victim and threatened to kill the Victim unless the Victim paid BERGER at least $100,000. The Victim was in Passaic, New Jersey, at the time. Historical cell-site location information for the Phone Number shows that BERGER was in Suffern, New York, at the time.

### The FBI's Payment of Federal Funds to BERGER

14.    Based on my conversations with the Victim, my involvement in this investigation, and my review of FBI and bank records, I know the following:

    a.    In early January 2024, the Victim told me that, based on MOSHE BERGER's, the defendant's, statements, he was concerned that his physical safety would be jeopardized unless he promptly paid BERGER more money. I directed the Victim to ask BERGER where the funds should be sent. BERGER provided an account number at a particular bank (the "Bank Account").

    b.    On or about January 12, 2024, law enforcement officers sent $4799.72 in government funds to the Bank Account.

    c.    Bank records show that BERGER is the listed account holder for the Bank Account and that the Bank Account received this money on or about January 12, 2024.

WHEREFORE, I respectfully request that a warrant be issued for the arrest of MOSHE BERGER, the defendant, and that he be arrested, and imprisoned or bailed, as the case may be.

    /s/ sworn telephonically
    _____
    JENNIFER LEWIS
    SPECIAL AGENT
    FEDERAL BUREAU OF INVESTIGATION

Sworn to before me by telephone this 14th day of February, 2024.

*[signature: Gabriel W. Gorenstein]*

_____
THE HONORABLE GABRIEL W. GORENSTEIN
United States Magistrate Judge
Southern District of New York